IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RODNEY NEAL ARNOLD,** | : | CIVIL NO. 1:14-CV-345 |
| | : | |
| Plaintiff | : | **(Chief Judge Conner)** |
| | : | |
| v. | : | |
| | : | |
| **PRISON HEALTH SERVICES,** | : | |
| *et al.*, | : | |
| Defendants | : | |

## MEMORANDUM

Plaintiff Rodney Neal Arnold ("Arnold"), an inmate formerly housed at the State Correctional Institutions at Camp Hill, Pennsylvania ("SCI-Camp Hill"), and Houtzdale, Pennsylvania ("SCI-Houtzdale")[1], commenced this civil action in the United States District Court for the Western District of Pennsylvania on January 23, 2014. (Doc. 1). The matter is proceeding *via* a fourth amended complaint. (Doc. 30). Presently before the court are two motions (Docs. 80, 83) pursuant to Federal Rule of Civil Procedure 56 filed by defendants Werner Eye Associates, Dr. Richard Lanning, Dr. Steven N. Truong, Dr. Lawrence Ho, Dr. Michael Banach, Dr. Prensky, Dr. Thomas Pheasant, (hereinafter "eye care defendants"), and Prison Health Services ("PHS"). Defendants seek an entry of judgment on the remaining

---

[1] Arnold is no longer incarcerated.

Eighth Amendment claims.[2]  Arnold failed to file briefs in opposition to defendants' motions for summary judgment.[3]  Therefore, defendants' motions are deemed unopposed and ripe for disposition.  See Local Rule 7.6.  For the reasons that follow, the court will grant both motions.

I.      **Standard of Review**

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(a), (c).  The burden of proof is upon the nonmoving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the nonmoving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action proceed.  Pappas, 331 Supp. 2d at 315.

---

[2] On September 22, 2014, the court granted defendants' motions to dismiss as to Arnold's Fourteenth Amendment claims and dismissed these claims in their entirety, but denied the motions as to Arnold's Eighth Amendment claims.  (Docs. 68, 69).

[3] By order dated December 11, 2015, the court directed Arnold to file briefs in opposition to defendants' motions.  (Doc. 88).  To date, Arnold has failed to oppose defendants' motions.

## II.     Statement of Material Facts[4]

Arnold's Eighth Amendment claims are based on his allegations that defendants either delayed or denied treatment for his "badly infected" eye while incarcerated at SCI-Camp Hill and SCI-Houtzdale. (Doc. 30, ¶¶ 24-26, 28; Doc. 82, ¶ 5; Doc. 85, ¶¶ 1, 9). On February 14, 2011, Arnold was transferred from SCI-Camp Hill to SCI-Houtzdale. (Doc. 85, ¶ 10). At the time of this transfer, Arnold had no complaints related to eye pain, instead he only complained of knee pain related to osteoarthritis and neuropathy associated with his diabetes mellitus. (Doc. 85, ¶ 11).

Arnold first reported vision problems on August 16, 2011, and was placed on-line to see an eye doctor. (Doc. 85, ¶¶ 12, 13). On August 31, 2011, an ophthalmology consult was ordered. (Doc. 85, ¶ 14). On September 1, 2011, Dr. Marcovitch, a non-party physician at Werner Eye Associates, completed the ophthalmology consultation and referred Arnold to Pennsylvania Retina Specialists, P.C., for further evaluation and treatment. (Doc. 82, ¶ 3; Doc. 85, ¶¶ 15, 16). Drs. Lanning, Truong, Ho, Baker, and Prensky, physicians at Pennsylvania Retina Specialists, treated Arnold for his eye problems. (Doc. 82, ¶ 4; Doc. 87, Ex. A, ¶ 4). [5]

---

[4] The court ordered Arnold to file a response to defendants' Local Rule 56.1 statements of material facts. (Doc. 88). Arnold failed to do so. Therefore, defendants' statements of material facts are deemed admitted. See Local Rule 56.1.

[5] Although named defendants in their roles as physicians at Pennsylvania Retina Specialist, neither Dr. Banach nor Dr. Pheasant treated Arnold. Hence, their motions for summary judgment will be granted without further discussion.

3

Dr. Lanning first treated Arnold on September 19, 2011. (Doc. 85, ¶ 17; Doc. 87, Ex. A. ¶ 5). At this initial visit, Dr. Lanning noted that Arnold was diabetic and complained of blurry vision in his right eye. (Id.) Upon examination, Dr. Lanning noted that the vision in Arnold's right eye was 2/200, rendering him legally blind, and that he had a macular edema in the right eye. (Id.) Dr. Lanning diagnosed Arnold with central retinal vein occlusion in his right eye and recommended that he receive intravitreal injections into his right eye. (Id.) On September 29, 2011, Arnold executed a consent form for the administration of Lucentis injections into his right eye. (Doc. 87, Ex. A, ¶ 7; Doc. 87, Ex. A, Attach. B). The consent form advised that Arnold's "condition may not get better or may get worse. Any or all of the following complications may cause decreased vision and/or have a possibility of causing blindness. … Possible complications of the procedure and administration of Lucentis include but are not limited to retinal detachment, cataract formation…, glaucoma…, hypotony…, damage to the retina or cornea…, and bleeding." (Id.)

Dr. Lanning again treated Arnold on November 2, 2011, and December 15, 2011, and administered Lucentis injections into his right eye at each visit. (Doc. 85, ¶¶ 19-21; Doc. 87, Ex. A, ¶¶ 8, 9).

On January 30, 2012, Dr. Lanning noted that the vision in Arnold's right eye was 6/200, and he diagnosed a macular hole in Arnold's right eye. (Doc. 85, ¶ 25; Doc. 87, Ex. A, ¶ 9; Doc. 87, Ex. A, Attach. F). Macular holes are not associated with Lucentis injections, but are a known consequence with macular edema, which was present in Arnold's right eye at his initial visit on September 19, 2011. (Id.) Dr.

4

Lanning recommended that Arnold undergo a surgical procedure called a vitrectomy. (Id.) Arnold agreed to the surgery and executed a written consent on January 30, 2012. (Doc. 82, ¶ 8; Doc. 87, Ex. A, ¶ 10; Doc. 87, Ex. A, Attach. G). The consent form advised that the surgery may not improve the eyesight in Arnold's right eye. (Id.) The form specifically stated as follows:

> In the performance of a pars plana vitrectomy with membrane/vitreous removal, gad/fluid exchange, there is no guarantee of improved vision, of maintaining present vision or even accomplishing the desired objective of closing the macular hole. Although rare, complications can occur. More common risks include but are not limited to: cataract or increase in pressure in the eye (glaucoma). Less common risks include but are not limited to: failure to accomplish the intent of the surgery (which is to close the macular hole), retinal detachment (which may require additional surgery or may be inoperable), vitreous hemorrhage, infection, permanent blindness, loss of the eye or, although highly remote, death is possible.

(Doc. 87, Ex. A, Attach. G).

On February 10, 2012, Arnold was transferred to SCI-Camp Hill and surgery was scheduled for February 14, 2012 at Holy Spirit Hospital. (Doc. 85, ¶ 28). On February 13, 2012, Arnold was admitted to the infirmary at SCI-Camp Hill to prepare for surgery. (Doc. 85, ¶ 29).

On February 14, 2012, Dr. Lanning performed surgery on Arnold's right eye to attempt to repair the macular hole. (Doc. 85, ¶ 30; Doc. 87, Ex. A, ¶11). There were no complications with the surgery. (Doc. 87, Ex. A, ¶11). After the surgery, and on the same day, Arnold returned to SCI-Camp Hill. (Doc. 85, ¶ 31). Arnold received postoperative care by medical providers at SCI-Camp Hill. (Doc. 85, ¶ 32).

On February 15, 2012, Arnold had his first postoperative visit with Dr. Truong. (Doc. 85, ¶¶ 33, 34; Doc. 87, Ex. A, ¶ 12). Dr. Truong noted that Arnold's condition was stable with no complications. (Doc. 87, Ex. A, ¶ 12; Doc. 87, Ex. A, Attach. I).

On February 23, 2012, Dr. Ho treated Arnold at his second postoperative visit. (Doc. 85, ¶ 34; Doc. 87, Ex. A, ¶ 13; Doc. 87, Ex. A, Attach. J). Dr. Ho noted moderate to high pressure in Arnold's right eye, a common postoperative condition. (Doc. 87, Ex. A, ¶ 13; Doc. 87, Ex. A, Attach. J). Dr. Ho prescribed eye drops to treat the pressure in Arnold's eye. (Id.) On February 24, 2012, Arnold was discharged to block housing and was medically cleared for transfer back to SCI-Houtzdale. (Doc. 85, ¶ 36). On February 27, 2012, Arnold was transferred to SCI-Houtzdale. (Doc. 85, ¶ 37).

On March 5, 2012, Dr. Lanning treated Arnold and noted that the pressure in his eye had normalized. (Doc. 85, ¶¶ 38, 39; Doc. 87, Ex. A, ¶ 14; Doc. 87, Ex. A, Attach. K). On March 28, 2012, Dr. Lanning treated Arnold at a postoperative evaluation, and noted that the pressure in his eye remained normal and his right eye vision was 4/200. (Doc. 85, ¶ 40; Doc. 87, Ex. A, ¶ 15; Doc. 87, Ex. A, Attach. L). Dr. Lanning recommended a follow-up visit in eight weeks. (Id.) On May 23, 2012, Dr. Lanning again treated Arnold for a postoperative evaluation of his right eye. (Doc. 85, ¶ 42; Doc. 87, Ex. A, ¶ 16; Doc. 87, Ex. A, Attach. M). Dr. Lanning noted that Arnold's ocular condition was stable and the vision in his right eye was 6/200. (Id.)

On November 9, 2012, Arnold was assaulted in a prison fight and injured his left eye. (Doc. 85, ¶ 44). On December 5, 2012, Dr. Baker, a non-party physician at Pennsylvania Retina Specialists, treated Arnold and performed a laser treatment for the retina tear in his left eye. (Doc. 85, ¶ 45; Doc. 87, Ex. A, ¶ 17; Doc. 87, Ex. A, Attach. N). Dr. Baker further noted that the vision in Arnold's right eye was 3/200 and remained stable. (Id.)

On December 27, 2012, Dr. Prensky treated Arnold for an evaluation of the left retinal tear and the macular hole repair of the right eye. (Doc. 85, ¶ 47; Doc. 87, Ex. A, ¶ 18; Doc. 87, Ex. A, Attach. O). Dr. Prenksy recommended that Arnold wear an eye-patch to alleviate discomfort, and scheduled a follow-up visit. (Id.) Arnold did not receive any further medical treatment from Pennsylvania Retina Specialists following his December 27, 2012 visit with Dr. Prensky. (Doc. 87, Ex. A, ¶ 19). Arnold was thereafter scheduled to see a retina specialist on March 25, 2013, but he refused treatment. (Doc. 85, ¶ 51).

On June 3, 2013, a prison official cancelled Arnold's July 15, 2013 appointment with Retina Specialists per Arnold's request. (Doc. 87, Ex. A, ¶ 19; Doc. 87, Ex. A, Attach. P). The prison official explained that Arnold "signed papers refusing any and all health treatment." (Id.) The eye care defendants had no involvement in the creation or implementation of any policies, customs, or procedures at SCI-Camp Hill or SCI-Houtzdale. (Doc. 82, ¶ 11; Doc. 87, Ex. A, ¶ 21; Doc. 87, Ex. B, ¶ 6).

Arnold did not file any grievances related to any policy, practice or procedure utilized by PHS in the care and treatment of inmates. (Doc. 85 ¶¶54, 55).

**III. Discussion**

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials. See 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Id.; see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

The Eighth Amendment's proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. See Estelle v. Gamble, 429 U.S. 97, 103-05 (1976). In order to establish an Eighth Amendment medical claim, a plaintiff "must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Natale v. Camden County Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (citing Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)). A serious medical need is

"one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the necessity for a doctor's attention." Monmouth Cty. Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).  In addition, "if unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment."  Id. (citation omitted).

A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  Mere negligence, unsuccessful medical treatment, or medical malpractice do not give rise to a § 1983 cause of action, and an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference.  See Estelle, 429 U.S. at 106; Spruill v. Gillis, 372 F.3d 218, 237 (3d Cir. 2004); Monmouth Cty., 834 F.2d at 346.

    **A.**    **Eye Care Defendants' Motion for Summary Judgment**

        1.    Failure to State a Claim

The eye care defendants argue that Arnold fails to allege any facts which could support a claim that they acted with deliberate indifference to his medical needs. (Doc. 87, at 17-23).  As stated *supra*, the Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated."  Rouse, 182 F.3d at 197.  In the context of medical care, the relevant inquiry is

9

whether the defendant was deliberately indifferent to the plaintiff's serious medical needs.  See Monmouth Cty., 834 F.2d at 346.

The evidence of record clearly demonstrates that Arnold received medical attention while incarcerated at SCI-Camp Hill and SCI-Houtzdale, and that the attention he received lacks the requisite deliberate indifference to support a § 1983 claim.  Arnold has failed to produce any evidence demonstrating that the eye care defendants delayed or denied medical treatment.  Indeed, Arnold acknowledges that he did receive medical care while incarcerated, and that he was "hospitalized on more than several occasions." (Doc. 30, ¶¶ 24, 27).  Moreover, the eye care defendants produced uncontroverted evidence of Arnold's extensive medical treatment.

With respect to Arnold's allegations that the eye care defendants delayed or denied medical care, the court finds that their actions do not amount to deliberate indifference to Arnold's serious medical needs.  Drs. Lanning, Truong, Ho, Baker, and Prensky treated Arnold on numerous occasions during the relevant time period.  The evidence reveals that Arnold received outside medical care on the following dates: 9/1/11, 9/19/11, 9/29/11, 11/2/11, 12/15/11, 1/30/12, 2/10/12, 2/14/12, 2/15/12, 2/23/12, 3/5/12, 3/28/12, 5/23/12, 11/9/12, 12/5/12, and 12/27/12.  (Doc. 87, Ex. A).

Arnold first complained of vision problems on August 16, 2011, and was promptly treated on September 1, 2011 by Werner Eye Associates.  (Doc. 82, ¶ 3). Werner Eye Associates immediately referred Arnold to Pennsylvania Retina Specialists where he treated with Drs. Lanning, Truong, Ho, Baker, and Prensky.

(Doc. 82, ¶ 4; Doc. 87, Ex. A, ¶ 4). Dr. Lanning initially diagnosed Arnold with central retinal vein occlusion in his right eye, and recommended a course of injections to treat the vein occlusion. Arnold expressly consented to the administration of Lucentis injections into his right eye. (Doc. 87, Ex. A, ¶ 7; Doc. 87, Ex. A, Attach. B). Dr. Lanning administered additional Lucentis injections into Arnold's right eye on September 29, 2011, November 2, 2011, and December 15, 2011. (Doc. 87, Ex. A, ¶¶ 8, 9).

On January 30, 2012, Dr. Lanning diagnosed a macular hole in Arnold's right eye and, after obtaining Arnold's consent, Dr. Lanning performed surgery on Arnold's right eye on February 14, 2012. (Doc. 82, ¶ 8; Doc. 87, Ex. A, ¶¶ 10, 11; Doc. 87, Ex. A, Attach. G). Arnold received extensive postoperative care by medical providers at SCI-Camp Hill, and by Drs. Truong, Ho, and Lanning. (Doc. 87, Ex. A, ¶¶ 12-16).

Dr. Baker thereafter treated Arnold for an eye injury he sustained during a prison fight. (Doc. 87, Ex. A, ¶ 17; Doc. 87, Ex. A, Attach. N). Arnold also received additional medical care from Dr. Prensky. (Doc. 87, Ex. A, ¶ 18; Doc. 87, Ex. A, Attach. O). Arnold refused any further health treatment from Pennsylvania Retina Specialists following his December 27, 2012 visit. (Doc. 87, Ex. A, ¶ 19; Doc. 87, Ex. P).

The record reflects that Arnold has a serious medical need. The record further demonstrates that Arnold was provided with ongoing care for his eye conditions. The medical record is replete with documentation revealing that

Arnold was provided with medical care at the prison, was referred to outside specialists, treated by outside specialists, and underwent procedures and surgery. In light of the undisputed evidence, the court finds that the eye care defendants were not deliberately indifferent to Arnold's medical needs. Although Arnold may not be wholly satisfied with the treatment he received while incarcerated, the eye care defendants' actions do not amount to deliberate indifference. See, e.g., Gindraw v. Dendler, 967 F. Supp. 833, 836 (E.D. Pa. 1997) ("[T]he exercise by a doctor of his professional judgment is never deliberate indifference."). Arnold failed to produce any evidence that any purported delay or deficiency in medical care led to an adverse effect on his eye condition.

       To the extent that Arnold disagrees with the medical care provided, claims of medical malpractice and disagreements as to the proper course of medical treatment simply do not suffice to satisfy the deliberate indifference standard. See Monmouth Cty., 834 F.2d at 346; Carpenter v. Kloptoski, No. 08-2233, 2012 WL 983565, at *6 (M.D. Pa. 2012) (citing White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990)) (observing that "a prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference"). Moreover, courts will not second guess whether a particular course of treatment is adequate or proper. See Parham v. Johnson, 126 F.3d 454, 458 n.7 (3d Cir. 1997) (quoting Inmates of Allegheny Cty. Jail, 612 F.2d at 762). Consequently, the eye care defendants' motion for summary judgment will be granted, and judgment will be entered in their favor.

      2.      Official Capacity Claims

The eye care defendants further argue that they are entitled to an entry of judgment in their favor because Arnold's official capacity claims are barred by sovereign immunity. (Doc. 87, at 23-24). Personal capacity suits under section 1983 seek to recover money from a government official, as an individual, for acts performed under color of state law. Gregory v. Chehi, 843 F.2d 111, 120 (3d Cir. 1988). Official capacity suits, in contrast, generally represent an action against an entity of which the government official is an agent. Id.; see also Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 690 n. 55 (1978). When suits are brought against state officials in their official capacities, those lawsuits are treated as suits against the state. Hafer v. Melo, 502 U.S. 21, 25 (1991). However, the doctrine of sovereign immunity, established by the Eleventh Amendment, protects states, such as the Commonwealth of Pennsylvania, from suits by citizens. Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100-01, 117 (1984); Seminole Tribe v. Florida, 517 U.S. 44, 54 (1996); Lavia v. Pennsylvania, 224 F.3d 190, 195-96 (3d Cir. 2000). That immunity runs to state officials if they are sued in their official capacity and the state is the real party upon which liability is sought. Scheuer v. Rhodes, 416 U.S. 232, 237-38 (1974). Congress has not abrogated the immunity regarding Arnold's claims, nor has Pennsylvania waived this grant of immunity. See 42 Pa.C.S.A. § 8521(b). Consequently, Arnold's claims for money damages against the eye care defendants in their official capacity are barred by sovereign immunity. See Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 254 (3d Cir. 2010).

**B.    Prison Health Services' Motion for Summary Judgment**

Prison Health Services, the entity that previously provided medical services to the Pennsylvania Department of Corrections[6], seeks an entry of judgment in their favor based on Arnold's failure to state claim. (Doc. 84). To the extent that Arnold attempts to establish liability against PHS as the entity responsible for providing health care services to inmates at State Correctional Institutions, and as the employer of any individuals that allegedly failed to provide adequate health care, his claims must be dismissed.

A private entity which contracts with the state to perform a traditional state function, such as providing medical services in correctional facilities, may be sued under § 1983 as one acting "under color of state law." West v. Atkins, 487 U.S. 42, 54 (1988); Donnell v. Corr. Health Servs., Inc., 405 F. App'x 617, 622 n. 5 (3d Cir. 2010). For § 1983 purposes, PHS "cannot be held responsible for the acts of its employees under a theory of respondeat superior or vicarious liability." Natale v. Camden County Corrections Facility, 318 F.3d 575, 584 (3d Cir. 2003). Rather, to establish a viable § 1983 claim against a private corporate entity such as PHS, a plaintiff must allege that the entity had a policy, practice, or custom which caused injury to the plaintiff. See Adonai-Adoni v. King, 2009 WL 890683, *2 (E.D. Pa. 2009) (noting that a private medical provider can only be liable under § 1983 if the claim rests upon some policy, practice or custom); see also Carpenter v. Kloptoski, 2010 WL 891825, *8 (M.D. Pa. 2010) (concluding that a § 1983 claim against a private medical service

---

[6] Prison Health Services' contract to provide medical services to the Pennsylvania Department of Corrections expired on December 31, 2012. (Doc. 85, ¶ 49).

solely on the basis that it was responsible for providing health care is subject to dismissal). Mere identification of a policy or custom is not enough to establish liability; a plaintiff must also establish causation. In this regard, a plaintiff carries the burden of demonstrating a "plausible nexus" or "affirmative link" between the health care provider's custom or policy and the constitutional deprivation at issue. Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990). As such, there is no liability for the alleged misconduct of employees absent a link or nexus between the custom or policy and the employee's misconduct because such liability would be predicated upon the doctrine of *respondeat superior*. Monell, 436 U.S. at 691.

For purposes of § 1983 analysis, a policy is made when a decision-maker with final authority to establish such a policy issues an official proclamation, policy or edict. See Andres v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990); Unterberg v. Corr. Med. Sys., Inc., 799 F.Supp. 490, 497-98 (E.D. Pa. 1992). A custom on the other hand, "can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." Bielevicz, 915 F.2d at 850. As a result, custom can be established by "proof of knowledge and acquiescence," Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir. 1989); Unterberg, 799 F.Supp. at 498.

In the case *sub judice*, Arnold must demonstrate deliberate indifference by proving that there is an established policy or custom which caused PHS to deny or to delay access to necessary medical treatment for non-medical reasons. See Estelle v. Gamble, 429 U.S. 97, 104-05 (1976); Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

Arnold alleges that PHS failed "to maintain adequate medical records and documentation, thereby impeding medical treatment", failed "to provide proper follow up", failed "to refer Plaintiff to appropriate outside medical treatment", and failed "to evaluate results before sending Plaintiff out for surgery again on his already infected eye." (Doc. 30, ¶ 15). Arnold further asserts that PHS failed to appropriately monitor and diagnose lab reports, failed to timely treat serious medical ailments, failed to provide adequate trained staff, and failed to timely and adequately answer sick call requests. (Id.) Although Arnold blames these failures on various policies, practices and customs of PHS, he failed to provide any evidence in support of these claims. Specifically, he failed to produce any evidence that his medical care was delayed or denied by PHS, or that PHS has a policy of delaying medical treatment or providing inadequate medical care. On the contrary, PHS has produced uncontroverted evidence that it provided Arnold with medical treatment on numerous occasions, and referred him for outside medical care numerous times from September 2011 through December 2012, and that Arnold underwent procedures and surgery in an attempt to resolve his eye issues.

In order to survive summary judgment, Arnold must present evidence of a policy, practice, or custom which caused or exacerbated a serious medical need and was instituted with deliberate indifference to the consequences. See Williams v. Guard Bryant Fields, 535 F. App'x 205 (3d Cir. 2013) (affirming the district court's entry of summary judgment in favor of PHS on plaintiff's claim for denial of medical treatment, finding that plaintiff failed to show that refusal to fill a prescription was undertaken pursuant to a PHS policy). Arnold has simply failed to provide the

16

court with any evidence that defendant PHS engaged in a policy, practice or custom that violated his constitutional rights.  PHS' voluminous medical records do not illustrate a policy or custom of indifference to Arnold's medical needs, rather they illustrate a policy of providing Arnold with medical care.  Moreover, Arnold's attempt to attribute specific acts to PHS likewise fails because a private corporation performing a state function cannot be held liable under a theory of *respondeat superior*.  See Weigher v. Prison Health Servs., 402 F. App'x 668, 669-70 (3d Cir. 2010) (holding that a private corporation providing medical services at a state correctional facility cannot be held liable under a theory of *respondeat superior* in a § 1983 suit).  Therefore, Prison Health Services' motion for summary judgment will be granted and judgment will be entered in favor of Prison Health Services.

## IV.   Conclusion

Based on the foregoing, defendants' motions for summary judgment (Docs. 80, 83) will be granted.  An appropriate order will issue.

    /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:        March 11, 2016